1  ANDREW L. PACKARD (State Bar No. 168690)
   Law Offices of Andrew L. Packard
2  100 Petaluma Blvd. N., Suite 301
   Petaluma, CA 94952
3  Tel:  (707) 763-7227
   Fax: (707) 763-9227
4  E-mail:  Andrew@PackardLawOffices.com

5  ROBERT J. TUERCK (State Bar No. 255741)
   Jackson & Tuerck
6  P.O. Box 148
   429 W. Main Street, Suite C
7  Quincy, California 95971
   Telephone: (530) 283-0406
8  Fax: (530) 283-0416
   Email:  Bob@jacksontuerck.com

9  Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
10 PROTECTION ALLIANCE

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13

14 CALIFORNIA SPORTFISHING            Case No. 3:12-CV-06274-SI
   PROTECTION ALLIANCE, a non-profit
15 corporation,                       **STIPULATION TO DISMISS
                                      PLAINTIFF'S CLAIMS WITH
16            Plaintiff,              PREJUDICE; [~~PROPOSED~~] ORDER
                                      GRANTING DISMISSAL WITH
17       vs.                          PREJUDICE [FRCP 41(a)(2)]**

18 GEORGIA-PACIFIC GYPSUM LLC, a
   Delaware limited liability company;  (Federal Water Pollution Control Act,
19 GEORGIA-PACIFIC BUILDING           33 U.S.C. § 1251 *et seq.*)
   PRODUCTS LLC, a Delaware limited
20 liability company,

21            Defendants.

22

23

24

25

26

27

28

   STIP TO DISMISS; ORDER THEREON          1          CASE NO. 3:12-CV-06274-SI

Plaintiff California Sportfishing Protection Alliance ("PLAINTIFF" or "CSPA"), and Defendants in the above-captioned action hereby stipulate as follows:

**WHEREAS**, on or about October 11, 2013, CSPA provided DEFENDANTS with a Notice of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, on December 11, 2013, CSPA filed its Complaint against DEFENDANTS in this Court, *California Sportfishing Protection Alliance v. Georgia Pacific Gypsum LLC, et al.*; USDC, N.D. Cal., Case No. 3:12-cv-06274-SI;

**WHEREAS**, CSPA and DEFENDANTS, through their authorized representatives and without either adjudication of CSPA's claims or admission by DEFENDANTS of any alleged violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations of CSPA as set forth in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs and uncertainties of further litigation.  A copy of the Parties' proposed settlement agreement ("Settlement Agreement") entered into by and between CSPA and DEFENDANTS is attached hereto as **Exhibit A** and incorporated by reference.

**WHEREAS**, CSPA submitted the Settlement Agreement via certified mail, return receipt requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day review period set forth at 40 C.F.R. § 135.5 has been completed without objection by the agencies.

**NOW THEREFORE, IT IS HEREBY STIPULATED** and agreed to by and between the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties respectfully request an order from this Court dismissing such claims with prejudice.  In accordance with Paragraph 19(b) of the Settlement Agreement, the Parties also request that this Court retain and have jurisdiction over the Parties through September 30, 2015, for the sole

1   purpose of resolving any disputes between the parties with respect to enforcement of any

2   provision of the Settlement Agreement.

3

4   Dated:  July 22, 2013                    LAW OFFICES OF ANDREW L. PACKARD

5

6                                            By:__/s/_____
                                             Andrew L. Packard
7                                            Attorneys for Plaintiff
                                             CALIFORNIA SPORTFISHING PROTECTION
8                                             ALLIANCE

9

10

11  Dated:  July 22, 2013                    COX CASTLE NICHOLSON

12

13                                           By:__/s/_____
                                             Robert Doty (As authorized by L.R. 131)
14                                           Attorneys for Defendants
                                             GEORGIA-PACIFIC GYPSUM LLC and
15                                           GEORGIA-PACIFIC BUILDING PRODUCTS
                                             LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

STIP TO DISMISS; ORDER THEREON          3              CASE NO. 3:12-CV-06274-SI

**[PROPOSED] ORDER**

Good cause appearing, and the Parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's claims against Defendants Georgia-Pacific Gypsum LLC and Georgia Pacific Building Products LLC as set forth in CSPA's 60-Day Notice Letter and Complaint filed herein, are hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except as provided for by the terms of the accompanying Settlement Agreement.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under the Settlement Agreement attached to the Parties' Stipulation to Dismiss as Exhibit A until September 30, 2015.

**IT IS SO ORDERED.**

Dated: _____7/23/13_____

_____
United States District Court Judge

**EXHIBIT A**

ANDREW L. PACKARD (State Bar No. 168690)
LAURIE A. MIKKELSEN (State Bar No. 260313)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGIA-PACIFIC GYPSUM LLC, a Delaware limited liability company; GEORGIA-PACIFIC BUILDING PRODUCTS, LLC, a Delaware limited liability company,<br><br>Defendants | Case No.  3:12-cv-06274-SI<br><br>**SETTLEMENT  AGREEMENT**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Georgia-Pacific Gypsum LLC and Georgia-Pacific Building Products, LLC (hereinafter "GP" and "Defendants") own an approximately 37-acre gypsum product manufacturing and distribution facility located at 801 Minaker Driver in Antioch, California (the "Facility");

**WHEREAS,** CSPA and Defendants collectively shall be referred to as the "Parties;"

1  **WHEREAS**, the Facility collects and discharges storm water from the Facility to  the San

2  Joaquin River and the Sacramento-San Joaquin River Delta (the "Delta") (a map of the Facility is

3  attached hereto as **Exhibit A** and incorporated herein by reference);

4  **WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant

5  to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001

6  [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water

7  Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Clean Water Act,

8  33 U.S.C. § 1342 (hereinafter "General Permit");

9  **WHEREAS**, on or about October 11, 2012, Plaintiff provided notice of Defendants' violations

10  of the Act ("CSPA Notice Letter"), and of its intention to file suit against Defendants and others, to the

11  Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of

12  EPA Region IX; the U.S. Attorney General; the Executive Director of the State Water Resources

13  Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board,

14  Central Valley Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. §

15  1365(b)(1)(A) (a true and correct copy of CSPA's Notice Letter is attached as **Exhibit B** and

16  incorporated herein by reference);

17  **WHEREAS**, Defendants deny the occurrence of the violations alleged in the Notice Letter and

18  maintains that GP has complied at all times with the provisions of the General Permit and the Clean

19  Water Act;

20  **WHEREAS**, the Parties agree that it is in their mutual interest to resolve the Clean Water Act

21  matter as to all entities and persons named in the Notice Letters without litigation and enter into this

22  Settlement Agreement ("Agreement");

23  **WHEREAS**, in order to gain the jurisdiction of the federal court, CSPA filed a complaint

24  ("Complaint") against Defendants in the United States District Court, Eastern District of California, on

25  December 11, 2012 (this matter hereinafter referred to as "the Action");

26  **WHEREAS**, for purposes of this Agreement, the Parties stipulate that venue is proper in this

27  Court, and that Defendants do not contest the exercise of jurisdiction by this Court to dismiss this

28

---

SETTLEMENT AGREEMENT

1   matter with prejudice under the terms of this Agreement;

2        **WHEREAS**, this Agreement shall be submitted to the United States Department of Justice for

3   the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and shall thereafter be submitted

4   for approval by the Court, the date of which approval shall be referred to herein as the "Court

5   Approval Date;"

6        **WHEREAS,** at the time the Agreement is submitted for approval to the United States District

7   Court, CSPA shall submit a Notice of Settlement and inform the Court of the expected dismissal date;

8        **AND WHEREAS**, upon expiration of the statutory review period, the Parties shall file with

9   the Court a Stipulation and Order that shall provide that the Complaint and all claims therein shall be

10  dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) and retain jurisdiction

11  for the enforcement of this Agreement as provided herein (the date of entry of the Order to dismiss

12  shall be referred to herein as the "Court Approval Date").

13       **NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING**

14  **PARTIES AS FOLLOWS:**

15  I.    **COMMITMENT OF DEFENDANTS**

16       **1.**     **Compliance With General Permit & Clean Water Act.** Beginning immediately,

17  and throughout the term of this Agreement, GP shall continue implementing all measures needed to

18  operate the Facility in compliance with the requirements of the General Permit[1] and the Clean Water

19  Act, subject to any defenses available under the law.

20       **2.**     **Implementation of Specific Storm Water Best Management Practices.** On or

21  before August 30, 2013, GP shall complete the implementation of the following storm water control

22  measures/best management practices ("BMPs"):

23           A.    *Storm Water Pollution Prevention Plan Mapping.* GP will revise the

24           Facility SWPPP map to display all information required under the General Permit. The

---

[1] Defendants agree to comply with the NPDES General Permit for storm water discharges associated with industrial activities, under Order No. NPDES No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ, that is current during the lifetime of this agreement.

map will identify the flow paths of all Facility storm water and all discharge points and areas to monitor so as to avoid the creation of new, undesignated discharge points.  The map will also clearly identify individual drainage sub-areas.

  B.  *Inspect, Repair & Maintain Currently Employed BMP Treatment Systems.* GP will inspect, repair and maintain all structural BMPs currently employed at the Facility, including but not limited to (1) attachment of all drain inlet filter bags; (2) placement of filter bags in any drain inlet that does not currently have one; and, (3) weekly inspection during the wet season and maintenance of all inlets to prevent clogging and to ensure functionality.

  C.  *Storm Water System Review.* GP will conduct a system wide evaluation of its storm water collection, conveyance and discharge system to determine what options are available and feasible to eliminate, reduce and/or treat its storm water discharge such that the Facility will comply with California's storm water discharge requirements.  This written evaluation shall include consideration of the relative costs and feasibility of (1) installing an infiltration basin at Outfall B sized to handle the flow capacity of the 95th percentile of historical rainfall for the region for a 2-year, 24-hour storm event at the Facility; (2) installing a treatment and/or filter system at Outfall B sized to handle the flow capacity of the 95th percentile of historical rainfall for the region for a 2-year, 1-hour storm event at the Facility; and (3) any further alternative measures incorporating infiltration, treatment and/or filtration that is properly sized, designed and implemented to achieve pollutant concentrations that are below EPA Benchmarks and California Toxics Rule levels.  Defendants shall provide a copy of the evaluation to CSPA no later than September 1, 2013, together with Defendants' selected option or options and a schedule for implementation of the selected option or options.  GP shall make best efforts to implement the selected option or options on or before November 1, 2013; in the event that, despite having made best efforts, GP is unable to implement the selected option or options on or before November 1, 2013, it shall so notify CSPA of this fact as soon as it becomes

apparent to GP, and shall provide detailed written monthly status updates to CSPA on the first of each month, beginning on December 1, 2013 and continuing until the selected option or options are fully implemented.  All selected options shall be fully implemented on or before August 1, 2014, at which point GP shall confirm this fact in writing to CSPA.

D.      *Berms in Area 2:*  GP will increase berming in the area around Outfall C to prevent storm water in Area 2 from traveling into Area 1 and discharging out Outfall C.

E.      *Piping.*  GP will inspect, map, and clean the storm water conveyance pipes at the facility.

F.      *Housekeeping:*

1.  GP will remove or cover stockpiled metal and boneyard materials.

2.  GP will increase tracking control, including improving the Tire Wash to eliminate offsite street tracking and establishing measures to limit vehicle tracking from Area 2 into all other areas.

3.  GP will employ a regenerative sweeper on all paved surfaces of the Facility. This measure will include sweeping the entrance, the area past the railway on Minaker Drive, and Minaker Drive for 600 feet in each direction from the Main Entrance to the Facility.  The sweeping will take place weekly during the Wet Season and monthly during the Dry Season.

4.  GP will make spill kits available and use around the Air Compressor.

G.      *Additional BMP measures in second year of Compliance Monitoring*: If GP's storm water discharge samples collected during the 2013-2014 Wet Season still contain pollutant concentrations above EPA benchmark values, then GP shall evaluate and implement additional appropriate measures as agreed upon by both Parties.

H.      *Rain Gauge.*  GP has a rain gauge onsite and agrees to maintain that rain gauge and to record daily rainfall at the Facility and maintain daily records of the rainfall recorded by that rain gauge in the Facility SWPPP.

**3.**      **SWPPP Amendments/Additional BMPs.**  Within 60 days of the Court Approval Date for this Agreement, GP shall formally amend the Facility SWPPP to incorporate all of the relevant requirements of this Agreement, as well as revise the Facility map attached hereto as **Exhibit A**.  These revisions shall reflect all current site conditions and practices and to identify potential Contaminants of Concern ("COC"), identify the location of all pervious and impervious areas, drain inlets, BMPs, and storm water flow vectors.  These revisions shall also provide for weekly monitoring and maintenance of *all* Facility collection and discharge points; and bi-annual storm water management training for Facility employees.

**4.**      **Sampling Frequency.**   GP shall collect and analyze samples from four (4) storm events, as qualified in the General Permit[2] for sampling purposes, in the first of two Wet Seasons occurring during the term of this Agreement (2013-2014).[3]  If none of the four samples exceed benchmark values, then GP is required to sample at least twice during the second Wet Season occurring during the term of this Agreement (2014-2015).  If any of the four samples taken during the first year of compliance monitoring contain values that exceed benchmark levels, then GP must sample four (4) storm events again the second year of compliance monitoring (2014-2015).  The storm water sample results shall be compared with the values set forth in **Exhibit C**, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit C**, GP shall comply with the "Action Memorandum" requirements set forth below.

**5.**      **Sampling Parameters.**  All samples shall be analyzed for each of the constituents listed in **Exhibit C** by a laboratory accredited by the State of California.  All samples collected from

---

[2]  "Qualifying Storm Events" under the General Permit are those events in which (i) the samples taken are preceded by at least three (3) working days during which no storm water discharges from the Facility have occurred; (ii) the samples are collected within the first hour that flow is observed at the Discharge Point being sampled; and (iii) the samples are collected during daylight operating hours.  General Permit, Section B.5.b. However, consistent with General Permit Section B.8.b., in the event that GP can demonstrate good cause as to why it was unable to collect samples of storm water discharges within the first hour of discharges occurring during an otherwise qualifying storm event, GP may collect storm water discharge samples as soon as practicable during an otherwise qualifying storm event occurring during daylight operating hours.

[3]  In the event that, despite having made best efforts, GP is unable to implement the measures described in I.2.C above on or before November 1, 2013, the term of this agreement shall be extended one additional year, to include the 2015-2016 Wet Season.  *See* Paragraph 11 and fn 4, below.

the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall be adequate to detect the individual constituents at or below the values specified on **Exhibit C**.  Sampling results shall be provided to CSPA within seven (7) business days of GP's receipt of the laboratory report from each sampling event pursuant to the Notice provisions below.

  **6.**  **"Action Memorandum" Trigger; CSPA Review Of "Action Memorandum"; Meet-and-Confer.**  If any sample taken during the two (2) Wet Seasons referenced in Paragraph 4 above exceeds the evaluation levels set forth in **Exhibit C**, or if GP fails to collect and analyze the agreed upon number of samples, then GP shall prepare a written statement discussing the exceedance(s) and/or failure to collect and analyze samples from the agreed upon number of storm events, the possible cause and/or source of the exceedance(s), and additional measures that will be taken to address and eliminate future exceedances and/or failure to collect samples ("Action Memorandum").  The Action Memorandum shall be provided to CSPA not later than July 15 following the conclusion of each Wet Season.  Recognizing that a SWPPP is an ongoing iterative process meant to encourage innovative BMPs, such additional measures may include, but are not limited to, taking confirmation samples, further material improvements to the storm water collection and discharge system, changing the type and frequency of Facility sweeping, changing the type and extent of storm water filtration media or modifying other industrial activities or management practices at the Facility.  Such additional measures, to the extent feasible, shall be implemented immediately if feasible and in no event later than sixty (60) days after the due date of the Action Memorandum.  Within seven (7) days of implementation, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum.  CSPA may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate and upon request by CSPA, GP agrees to meet and confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and sufficiency of the Action Memorandum.  CSPA's failure to comment or make suggestions in response to an Action Memorandum shall not be deemed to constitute agreement with any of the proposals set forth in the Action Memorandum.

7.      **Inspections During The Term Of This Agreement.**  In addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning an Action Memorandum as set forth above, GP shall permit representatives of CSPA to perform  two (2) physical inspections of the Facility during the term of this Agreement.  GP will allow a third inspection should the Facility exceed any bench mark values after the second inspection. These inspections shall be performed by CSPA's counsel and consultants and may include sampling, photographing, and/or videotaping and CSPA shall provide GP with a copy of all sampling reports, photographs and/or video.  CSPA shall provide at three business days advance notice of such physical inspection, except that GP shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals.  In such case, GP shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CSPA may proceed.  GP shall not make any alterations to Facility conditions during the period between receiving CSPA's initial advance notice and the start of CSPA's inspection that GP would not otherwise have made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with or required by any applicable laws or regulations.  Nothing herein shall be construed to prevent GP from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

8.      **GP Communications To/From Regional and State Water Boards.**  During the term of this Agreement, GP shall provide CSPA with copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Water Board and/or State Water Board as required by the General Permit.  Such documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth below and contemporaneously with GP's submission(s) to, or, receipt from, such agencies.

9.      **SWPPP Amendments.**  Pursuant to the Notice provisions set forth below, GP shall provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of the

1   Agreement within ten(10) business days of such amendment.

2   **II.     MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS**

3         **10.     Mitigation Payment In Lieu Of Civil Penalties.**  As mitigation to address any

4   perceived or potential harms from the Clean Water Act violations alleged in CSPA's Complaint, and

5   without admitting any harm occurred, GP agrees to pay the sum of $50,000, to the Rose Foundation

6   for Communities and the Environment ("Rose Foundation") within 30 days of the Court Approval

7   Date for projects to improve water quality in the San Joaquin River and/or the

8   Sacramento-San Joaquin River Delta.  Payment shall be remitted directly to the Rose Foundation by

9   mailing it to: Rose Foundation, Attn: Tim Little, 1970 Broadway, Suite 600, Oakland, CA 94612.

10        **11.     Compliance Monitoring Funding.**  To defray CSPA's reasonable investigative,

11  expert, consultant and attorneys' fees and costs associated with monitoring GP's compliance with this

12  Agreement, GP agrees to contribute $10,000 for the first of two Wet Seasons covered by this

13  Agreement and $5,000 for the second Wet Seasons ($15,000 total for the life of the Agreement[4]), to a

14  compliance monitoring fund maintained by counsel for CSPA as described below.  The first $10,000

15  shall be paid within thirty (30) days of the Court Approval Date and the second $5,000 shall be paid

16  by December 1, 2013.  All such payments shall be payable to "Law Offices of Andrew L. Packard

17  Attorney-Client Trust Account."  Compliance monitoring activities may include, but shall not be

18  limited to, site inspections, review of water quality sampling reports, review of annual reports,

19  discussions with representatives of GP concerning the Action Memoranda referenced above, and

20  potential changes to compliance requirements herein, preparation for and participation in meet-and-

21  confer sessions, water quality sampling and analysis, and compliance-related activities.

22        **12.     Fees & Costs.**  GP agrees to reimburse CSPA in the amount of $35,000 to defray

23  CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs

24  incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating a

---

[4]  However, in the event that, despite having made best efforts, GP is unable to implement the measures
described in I.2.C above on or before November 1, 2013, GP shall be obligated to contribute an additional
$5,000 to the compliance monitoring fund to cover CSPA's compliance monitoring costs for the 2015-2016
Wet Season.  Such payment shall be due on or before December 1, 2015.

1   resolution in the public interest.  This payment shall be made payable to "Law Offices of Andrew L.

2   Packard Attorney-Client Trust Account" and remitted to CSPA's counsel within ten (10) days of the

3   Court Approval Date.

4   **III.    DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

5        **13.**      With the exception of the timelines set forth above for addressing exceedances of

6   values specified on **Exhibit C** and Action Memoranda, if a dispute under this Agreement arises, or

7   either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer

8   within seven (7) days of receiving written notification from the other Party of a request for a meeting

9   to determine whether a violation has occurred and to develop a mutually agreed upon plan, including

10  implementation dates, to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-

11  confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer

12  occurred or should have occurred, either Party shall be entitled to all rights and remedies under the

13  law, including filing a motion with the District Court of California, Eastern District, which shall retain

14  jurisdiction over the Action for the limited purposes of enforcement of the terms of this Agreement.

15  The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and

16  costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water

17  Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such

18  provision.

19       **14.**      **CSPA's Waiver and Release.**  Upon the Court Approval Date of this Agreement,

20  CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors,

21  officers, agents, attorneys, representatives, and employees, releases Defendants and its officers,

22  directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of its predecessors,

23  successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each

24  a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action,

25  including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions,

26  mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum

27  incurred or claimed or which could have been claimed in this Action, for the alleged failure of

28

Defendants to comply with the Clean Water Act at the Facility, up to the Court Approval Date.

15.     **Defendants' Waiver and Release.**  Defendants, on their own behalf and on behalf of any Released Defendant Party under its control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

16.     **CSPA's Covenant Not to Sue**.   For the period beginning on the Court Approval Date of this Agreement and ending on the Termination Date of this Agreement, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against Defendants, or against the other entities or persons set forth in the Notice Letters, seeking relief for alleged violation of the Clean Water Act or violation of the General Permit at the Facility.  CSPA further agrees that, beginning on the Court Approval Date of this Agreement and ending on the Termination Date of this Agreement, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against Defendants, or against the other entities or persons set forth in the Notice Letters, that may be proposed by other groups or individuals who would rely upon the citizen suit provision to challenge Defendants' compliance with the Clean Water Act or the General Permit at the Facility.

17.     The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

While CSPA asserts that California Civil Code section 1542 applies to general releases only, and that the release in Paragraph 16 above is a limited release, the Parties hereby waive and relinquish any

rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the Notice Letters and/or the Complaint, up to and including the Court Approval Date of this Agreement.

18.     Within five (5) business days of the mutual execution of this Agreement, Plaintiff shall submit this Agreement to the United States Department of Justice ("DOJ") for the statutory 45-day agency review period set forth in 33 U.S.C. §1365(c) and submit a Notice of Settlement to the federal District Court.

19.     Within seven (7) days of the expiration of the agency review period, the Parties shall file with the Court a Stipulation and Order providing that:

      a.     the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and,

      b.     the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement.  Nothing in this Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Agreement.

## IV.    **MISCELLANEOUS PROVISIONS**

20.     The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Agreement shall be construed as, and Defendants expressly does not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

21.     The Agreement shall be effective upon mutual execution by all Parties.  The Agreement shall terminate on the "Termination Date," which shall be September 30, 2015, unless, despite having made best efforts, GP is unable to implement the measures described in I.2.C above on or before November 1, 2013, in which case the "Termination Date" of the agreement shall be September 30, 2016.

22. The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Agreement shall be valid as an original.

23. In the event that any one of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

24. The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Agreement shall be construed pursuant to California law, without regarding to conflict of law principles.

25. The undersigned are authorized to execute this Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Agreement.

26. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Agreement are contained herein. This Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise expressly provided for therein.

27. **Notices.** Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to CSPA pursuant to this Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
E-mail: DeltaKeep@me.com

With copies sent to:

Andrew L. Packard
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel:  (707) 763-7227

E-mail: Andrew@packardlawoffices.com

Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to Defendants pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Michael Evans
> 801 Minaker Road
> Antioch, California 94509
> michaelevans2@gapac.com

> With copies sent to:

> J. Michael Davis
> 133 Peachtree Street
> Atlanta, Georgia 30303
> jmdavis@gapac.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

28.     Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

29.     No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any circumstances beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm event, or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

30.     If for any reason the Court should decline to approve this Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Agreement in a mutually acceptable manner, this Agreement shall become null and void.

31.     This Agreement shall be deemed to have been drafted equally by the Parties, and

1 | shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

2 |     **32.**    This Agreement and the attachments contain all of the terms and conditions agreed
3 | upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior
4 | and contemporaneous agreements, negotiations, correspondence, understandings, and communications
5 | of the Parties, whether oral or written, respecting the matters covered by this Agreement. This
6 | Agreement may be amended or modified only by a writing signed by the Parties or their authorized
7 | representatives.

8 |     **33.**    Except in case of an emergency but subject to the regulatory authority of any
9 | applicable governmental authority, any breach of or default under this Agreement capable of being
10 | cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or
11 | default, or within such other period approved in writing by the Party making such allegation, which
12 | approval shall not be unreasonably withheld, the party allegedly in breach or default has completed
13 | such cure or, if the breach or default can be cured but is not capable of being cured within such five (5)
14 | day period, has commenced and is diligently pursuing to completion such cure.

15 |     The Parties hereto enter into this Agreement and respectfully submit it to the Court for its
16 | approval and entry.

17 | Dated: _____28 May_____, 2013    Califomia Sportfishing Protection Alliance

18 |
19 |     By: _____
20 |             Bill Jennings, Executive Director

20 | Dated: _____, 2013    Georgia-Pacific Gypsum LLC
21 |
22 |
23 |     By: _____
            Carmine Perri

24 | Dated: _____, 2013    Georgia-Pacific Building Products LLC
25 |
26 |     By: _____
27 |             Michael Thompkins
28 |

[PROPOSED] SETTLEMENT AGREEMENT

1   shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

2      **32.**     This Agreement and the attachments contain all of the terms and conditions agreed

3   upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior

4   and contemporaneous agreements, negotiations, correspondence, understandings, and communications

5   of the Parties, whether oral or written, respecting the matters covered by this Agreement.  This

6   Agreement may be amended or modified only by a writing signed by the Parties or their authorized

7   representatives.

8      **33.**     Except in case of an emergency but subject to the regulatory authority of any

9   applicable governmental authority, any breach of or default under this Agreement capable of being

10   cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or

11   default, or within such other period approved in writing by the Party making such allegation, which

12   approval shall not be unreasonably withheld, the party allegedly in breach or default has completed

13   such cure or, if the breach or default can be cured but is not capable of being cured within such five (5)

14   day period, has commenced and is diligently pursuing to completion such cure.

15      The Parties hereto enter into this Agreement and respectfully submit it to the Court for its

16   approval and entry.

17   Dated: _____, 2013    California Sportfishing Protection Alliance

18

19                By: _____

20                       Bill Jennings, Executive Director

  Dated: MAY 28 , 2013    Georgia-Pacific Gypsum LLC

21

22

23                By: _____
           JMD    Carmine Perri

24   Dated: MAY 29 , 2013    Georgia-Pacific Building Products LLC

25

26                By: _____

27           JMD    Michael Thompkins

28

**EXHIBIT A – Facility Site Map**



STORM WATER & SPCC DIAGRAM

WILBUR AVE.

GP GYPSUM LLC
801 N. MINAKER
ANTIOCH, CA 94509
GYPSUM WALLBOARD PLANT
November 2012

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



October 11, 2012

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Robert Cyphers, Plant Manager
Jeremiah Davis, Environmental Engineer and Facility Contact
Michael Woody, Senior Environmental Engineer and Facility Contact
Fred Curcio, Plant Manager
Georgia-Pacific Building Products LLC
Georgia-Pacific Gypsum LLC
801 Minaker Drive
P.O. Box 460
Antioch, CA 94509

Rick Turner, Facility Operator Contact
Manoj Mathur, Facility Operator Contact
Georgia-Pacific Building Products LLC
555 Park Place
Atlanta, GA 30303

CT Corporation System, Agent for Service of Process
Georgia-Pacific Gypsum LLC
818 W. 7th Street, 2nd Floor
Los Angeles, CA 90017

CT Corporation System, Agent for Service of Process
Georgia-Pacific Building Products LLC
818 W. 7th Street, 2nd Floor
Los Angeles, CA 90017

CT Corporation System, Agent for Service of Process
Georgia-Pacific Gypsum LLC
1201 Peachtree St. NE
Atlanta, GA 30361

Notice of Violation and Intent To File Suit
October 11, 2012
Page 2 of 18

CT Corporation System, Agent for Service of Process
Georgia-Pacific Building Products LLC
1201 Peachtree St. NE
Atlanta, GA 30361

**Re:     Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act**

Dear Messrs. Cyphers, Davis, Woody, Curcio, Turner and Mathur:

I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the
Georgia-Pacific Gypsum LLC and Georgia-Pacific Building Products LLC ("Georgia-
Pacific") facility, located at 801 Minaker Drive in Antioch, California ("the Facility").
The WDID identification number for the Facility is 5S07I020674.  CSPA is a non-profit
public benefit corporation dedicated to the preservation, protection and defense of the
environment, wildlife and natural resources of the San Joaquin River, the Sacramento-
San Joaquin River Delta and other California waters.  This letter is being sent to you as
the responsible owner, officer, or operator of the Facility.  Unless otherwise noted,
Georgia-Pacific Gypsum LLC, Georgia-Pacific Building Products LLC, Robert Cyphers,
Jeremiah Davis, Michael Woody, Fred Curcio, Rick Turner and Manoj Mathur shall
hereinafter be collectively referred to as Georgia-Pacific.

This letter addresses Georgia-Pacific's unlawful discharges of pollutants from the
Facility to the City of Antioch's storm water drainage system, the San Joaquin River and
the Sacramento-San Joaquin Delta.  This letter addresses the ongoing violations of the
substantive and procedural requirements of the Clean Water Act and National Pollutant
Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water
Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order
No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the
initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen
must give notice of intent to file suit.  Notice must be given to the alleged violator, the
U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations
occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File
Suit provides notice of the violations that have occurred, and continue to occur, at the
Facility.  Consequently, Georgia-Pacific Gypsum LLC, Georgia-Pacific Building
Products LLC, Robert Cyphers, Jeremiah Davis, Michael Woody, Fred Curcio, Rick
Turner and Manoj Mathur are hereby placed on formal notice by CSPA that, after the
expiration of sixty (60) days from the date of this Notice of Violation and Intent to File
Suit, CSPA intends to file suit in federal court against Georgia-Pacific Gypsum LLC,
Georgia-Pacific Building Products LLC, Robert Cyphers, Jeremiah Davis, Michael

Notice of Violation and Intent To File Suit
October 11, 2012
Page 3 of 18

Woody, Fred Curcio, Rick Turner and Manoj Mathur under Section 505(a) of the Clean
Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General
Permit.  These violations are described more fully below.

## I.      Background.

Georgia-Pacific owns and operates a gypsum product manufacturing facility
located in Antioch, California.  The Facility falls under Standard Industrial Classification
("SIC") Code 3275 ("Concrete, Gypsum, and Plaster Products").  The Facility is
primarily used to handle, store, manufacture and transport gypsum and gypsum
production-related materials such as wallboard.  Other activities at the Facility include
the use and storage of heavy machinery and motorized vehicles, including trucks used to
haul materials to, from and within the Facility.

Georgia-Pacific discharges storm water from its approximately 37-acre Facility
through at least three (3) discharge points into the City of Antioch's storm water drainage
system, the San Joaquin River and the Sacramento-San Joaquin Delta ("the Delta").  The
Delta and its tributaries are waters of the United States within the meaning of the Clean
Water Act.

The Central Valley Regional Water Quality Control Board ("Regional Board" or
"Board") has established water quality standards for the San Joaquin River, Sacramento
River and the Delta in the "Water Quality Control Plan for the Sacramento River and San
Joaquin River Basins," generally referred to as the Basin Plan.  The Basin Plan includes a
narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic
substances in concentrations that produce detrimental physiological responses in human,
plant, animal, or aquatic life."  For the Delta, the Basin Plan establishes standards for
several metals, including (at a hardness of 40 mg/L): arsenic – 0.01 mg/L; copper – 0.01
mg/L; iron – 0.3 mg/L; and zinc – 0.1 mg/L.  *Id.* at III-3.00, Table IIII-1.  The Basin Plan
states that "[a]t a minimum, water designated for use as domestic or municipal supply
(MUN) shall not contain lead in excess of 0.015 mg/L."  *Id.* at III-3.00.  The Basin Plan
also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."  *Id.* at
III-6.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that
"[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that
cause nuisance, result in a visible film or coating on the surface of the water or on objects
in the water, or otherwise adversely affect beneficial uses."  *Id.* at III-5.00.

The Basin Plan also provides that "[a]t a minimum, water designated for use as
domestic or municipal supply (MUN) shall not contain concentrations of chemical
constituents in excess of the maximum contaminant levels (MCLs)."  *Id.* at III-3.0.  The
EPA has issued a recommended water quality criterion for aluminum for freshwater
aquatic life protection of 0.087 mg/L.  EPA has established a secondary MCL, consumer
acceptance limit for aluminum of 0.05 mg/L to 0.2 mg/L.  EPA has established a
secondary MCL, consumer acceptance limit for zinc of 5.0 mg/L.  EPA has established a
primary MCL, consumer acceptance limit for Sulfate of 500 mg/L.  EPA has established

a secondary MCL, consumer acceptance limit for Sulfate of 250 mg/L.  EPA has established a primary MCL, consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L; and lead – 0.0 (zero) mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  The California Department of Health Services has also established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

EPA has also issued numeric receiving water limits for certain toxic pollutants in California surface waters, commonly known as the California Toxics Rule ("CTR").  40 CFR § 131.**38**.  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has also identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides and mercury.  *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf.  Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by Georgia-Pacific: iron – 1.0 mg/L and total suspended solids – 100.0 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance, 200 μmhos/cm.  Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to, aluminum – 0.75 mg/L; arsenic – 0.16854 mg/L; copper – 0.0636 mg/L; cyanide – 0.0636 mg/L; chemical oxygen demand – 120 mg/L; magnesium – 0.0636 mg/L; manganese – 1.0 mg/L; lead 0.0816 mg/L; mercury – 0.0024 mg/L; and zinc – 0.117 mg/L.

## II.      Georgia-Pacific Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Notice of Violation and Intent To File Suit
October 11, 2012
Page 5 of 18

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The San Joaquin River and the Delta and its tributaries are waters of the United States. Accordingly, Georgia-Pacific's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that Georgia-Pacific has discharged and is discharging pollutants from the Facility to waters of the United States every day that there has been or will be any measurable flow of water from the Facility since October 11, 2007. Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Georgia-Pacific is subject to penalties for violations of the Act since October10, 2007.

## III.    Pollutant Discharges in Violation of the NPDES Permit.

Georgia-Pacific has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit. 33 U.S.C. § 1342. The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or

prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id*.; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

As recently as May 1, 2008, the Regional Board, Region 5, sent Georgia-Pacific a letter ("the May 2008 letter") conveying its conclusion that, among other things, Georgia-Pacific' 2006-2007 Annual Report contained evidence that the BMPs then in effect at the Facility were not sufficient to reduce pollutant concentrations below EPA benchmark levels.  The May 2008 letter informed Georgia-Pacific that its 2006-2007 Annual Report indicated storm water samples in excess of US EPA benchmark values for certain parameters.  Based on this evidence, the Regional Board ordered Georgia-Pacific to: (1) Review previously submitted Annual Reports and identify the number of consecutive years that the Facility has exceeded benchmark levels; (2) Identify sources of pollutants at the Facility that contributed to the exceedances; (3) Review current BMPs; (4) Modify existing BMPs or implement additional BMPs to reduce or eliminate discharge of pollutants; and (5) Modify the SWPPP and Monitoring Plan for the Facility and maintain a copy of these required documents at the Facility.

Based on its review of available public documents, CSPA is informed and believes: (1) that Georgia-Pacific continues to discharge these very same pollutants in excess of benchmarks and (2) that Georgia-Pacific has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit.  Georgia-Pacific' ongoing violations are discussed further below.

### A.    Georgia-Pacific Has Discharged Storm Water Containing Pollutants in Violation of the Permit.

Georgia-Pacific has discharged and continues to discharge storm water with unacceptable levels of Iron (Fe), Total Suspended Solids (TSS), Sulfate ($SO_4^{2-}$) and Specific Conductance (SC) in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  Georgia-Pacific' Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

### 1.    Discharge of Storm Water Containing Iron (Fe) at Concentration in Excess of Applicable EPA Benchmark Value.

| Date | Sampling Location | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 4/25/2012 | B | Fe | 8.22 mg/L | 1.0 mg/L |
| 10/3/2011 | B | Fe | 2.09 mg/L | 1.0 mg/L |
| 2/25/2011 | B | Fe | 3.86 mg/L | 1.0 mg/L |
| 4/28/2010 | B | Fe | 2.8 mg/L | 1.0 mg/L |
| 1/3/2008 | B | Fe | 9.2 mg/L | 1.0 mg/L |
| 10/12/2007 | B | Fe | 1.9 mg/L | 1.0 mg/L |

Notice of Violation and Intent To File Suit
October 11, 2012
Page 8 of 18

2.   **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Sampling Location | Parameter | Concentration in Discharge | Benchmark Value |
|------|-------------------|-----------|----------------------------|-----------------|
| 4/25/2012 | B | TSS | 230 mg/L | 100 mg/L |
| 1/3/2008 | B | TSS | 190 mg/L | 100 mg/L |
| 10/12/2007 | B | TSS | 200 mg/L | 100 mg/L |

3.   **Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed EPA Benchmark Value.**

| Date | Sampling Location | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|------|-------------------|-----------|----------------------------|--------------------------|
| 4/25/2012 | B | SC | 1980 μmhos/cm | 200 μmhos/cm |
| 10/3/2011 | B | SC | 1980 μmhos/cm | 200 μmhos/cm |
| 2/25/2011 | B | SC | 636 μmhos/cm | 200 μmhos/cm |
| 4/28/2010 | B | SC | 940 μmhos/cm | 200 μmhos/cm |
| 10/19/2009 | B | SC | 830μmhos/cm | 200 μmhos/cm |
| 4/7/2009 | B | SC | 890 μmhos/cm | 200 μmhos/cm |
| 11/26/2008 | B | SC | 1900 μmhos/cm | 200 μmhos/cm |
| 1/3/2008 | B | SC | 870 μmhos/cm | 200 μmhos/cm |
| 10/12/2007 | B | SC | 2100 μmhos/cm | 200 μmhos/cm |

Notice of Violation and Intent To File Suit
October 11, 2012
Page 9 of 18

### 4. Discharge of Storm Water Containing Sulfate ($SO^{2-}_4$) at Concentration in Excess of EPA and/or California Water Quality MCL Primary and/or Secondary Value.

| Date | Sampling Location | Parameter | Concentration in Discharge | Water Quality Value |
|------|-------------------|-----------|----------------------------|---------------------|
| 4/25/2012 | B | $SO^{2-}_4$ | 1180 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 10/3/2011 | B | $SO^{2-}_4$ | 1100 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 2/25/2011 | B | $SO^{2-}_4$ | 315 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 4/28/2010 | B | $SO^{2-}_4$ | 480 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 10/19/2009 | B | $SO^{2-}_4$ | 370 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 4/7/2009 | B | $SO^{2-}_4$ | 410 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 11/26/2008 | B | $SO^{2-}_4$ | 910 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 1/3/2008 | B | $SO^{2-}_4$ | 460 mg/L | Primary -500 mg/L Secondary -250 mg/L |
| 10/12/2007 | B | $SO^{2-}_4$ | 1200 mg/L | Primary -500 mg/L Secondary -250 mg/L |

CSPA's investigation, including its review of Georgia-Pacific's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values for iron and total suspended solids, the State Board's proposed benchmark levels for specific conductivity, and the EPA's water quality primary and secondary MCLs for Sulfate indicates that Georgia-Pacific has not implemented BAT and BCT at the Facility for its discharges of Iron (Fe), Total Suspended Solids (TSS), Specific Conductance (SC), Sulfate (S) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit.  Georgia-Pacific was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations.  Thus, Georgia-Pacific is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that Georgia-Pacific has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least October 11, 2007.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain

event that has occurred since October 11, 2007, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Georgia-Pacific has discharged storm water containing impermissible levels of Iron (Fe), Total Suspended Solids (TSS), Specific Conductance (SC), Sulfate (S) and other unmonitored pollutants (e.g. aluminum (Al) and zinc (Zn)) in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Georgia-Pacific is subject to penalties for violations of the General Permit and the Act since October 11, 2007.

**B.      Georgia-Pacific Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the General Permit provides that "facility operators shall explain how the facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on its investigation, CSPA is informed and believes that Georgia-Pacific has failed to develop and implement an adequate Monitoring & Reporting Plan.  First, based on its review of publicly available documents, CSPA is informed and believes that Georgia-Pacific has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during the past five Wet Seasons. Second, based on its review of publicly available documents, CSPA is informed and believes that Georgia-Pacific has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during the past five Wet Seasons.

Notice of Violation and Intent To File Suit
October 11, 2012
Page 11 of 18

Third, based on its review of publicly available documents, CSPA is informed and believes that for the past five Wet Seasons Georgia-Pacific has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility.  Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Georgia-Pacific is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since October 11, 2007.  These violations are set forth in greater detail below:

>    **1.    Georgia-Pacific Has Failed to Collect Storm Water Samples During at Least Two Rain Events In Each of the Last Five Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that Georgia-Pacific has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past five years, as required by the General Permit.  For example, CSPA notes that the Annual Report filed by Georgia-Pacific for the Facility for the 2010-2011 Wet Season reported that Georgia-Pacific analyzed samples of storm water discharged during only one qualifying storm event that season.

Georgia-Pacific reported in all five Wet Seasons (i.e., 2007-2008; 2008-2009; 2009-2010; 2010-2011; and 2011-2012 Wet Seasons), that the Facility sampled the first storm of the season, when in fact it did not sample the first storm of the season during three of the last five Wet Seasons.  For example, Georgia-Pacific reported in its 2009-2010 Annual Report that it sampled the first storm of the Wet Season, but Georgia-Pacific' first sample is from October 19, 2009.  Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first storm of the 2009-2010 Wet Season occurred as early as Tuesday, October 13, 2009, when 3.09" of rain fell on the Facility.  This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

>    **2.    Georgia-Pacific Has Failed to Collect Storm Water Samples from Each Discharge Point During at Least Two Rain Events In Each of the Last Five Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that Georgia-Pacific has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past five Wet Seasons.  Despite acknowledging three discharge points at the Facility, Georgia-Pacific only sampled one discharge point.  Further, based on its investigation, CSPA is informed and believes that storm water discharges from the Facility at points other than the three sampling/discharge points currently designated by Georgia-Pacific.  This failure

to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

### 3. Georgia-Pacific Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." General Permit, Section B(4)(a). As evidenced by the lack of Facility personnel documenting their observation of qualified storm events on Form 4 Monthly Visual Observations contained in Georgia-Pacific' annual reports for the last five Wet Seasons, CSPA is informed and believes that Georgia-Pacific has failed to properly conduct this requirement of the General Permit.

Specifically, Georgia-Pacific failed to conduct monthly visual observations of discharges from qualifying storm events for most months during any of the past five Wet Seasons. Instead, Georgia-Pacific has either documented its visual observations of storm water that discharged during non-qualifying storm events or asserted that a qualifying storm never occurred at the Facility for most months during the entire Wet Season of each of the past five years (discussed further below). However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Georgia-Pacific could have observed. For example, Georgia-Pacific reported in its 2011-2012 Annual Report that there were no discharges during the month of December, 2011, when in fact, it rained 0.17" at the Facility on Thursday, December 15, 2011. Further, Georgia-Pacific reported in its 2010-2011 Annual Report that there were no discharges during the month of December, 2010, when in fact, it rained 0.24" at the Facility on Tuesday, December 14, 2010.Georgia-Pacific' failure to conduct this required monthly Wet Season visual monitoring extends back to at least October 11, 2007. Georgia-Pacific' failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

### 4. Georgia-Pacific Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since October 11, 2007.

CSPA is informed and believes that publicly available documents demonstrate Georgia-Pacific' consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit. For example, while in its 2010-2011 Annual Report Georgia-Pacific only reported having collected samples of storm water discharged during one qualifying storm event.

Additionally, Georgia-Pacific is in violation of the General Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations

present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program." General Permit Section B.10.a.iii. Georgia-Pacific exceeded holding time for pH in nearly every sample taken in any of the last five Wet Seasons (i.e., 2007-2008; 2008-2009; 2009-2010; 2010-2011; and 2011-2012 Wet Seasons). The lab reports in each of those Annual Reports identify these holding time exceedances, which can interfere with the validity of the analysis. Georgia-Pacific is in violation of the General Permit for failing to employ laboratory test methods and detection limits that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit." General Permit Section B.2.a. ("Monitoring Program Objectives").

Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Georgia-Pacific is subject to penalties for these violations of the General Permit and the Act since October 11, 2007.

## C.    Georgia-Pacific Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). CSPA's investigation indicates that Georgia-Pacific has not implemented BAT and BCT at the Facility for its discharges of Iron (Fe), Total Suspended Solids (TSS), Specific Conductance (SC), Sulfate ($SO_4^{2-}$) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, Georgia-Pacific must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility. Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Georgia-Pacific must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether. Georgia-Pacific has failed to adequately implement such measures.

Georgia-Pacific was required to have implemented BAT and BCT by no later than October 1, 1992. Therefore, Georgia-Pacific has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT. Georgia-Pacific is subject to penalties for violations of the General Permit and the Act occurring since October 11, 2007.

>        **D.    Georgia-Pacific Has Failed to Develop and Implement an Adequate
>               Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that Georgia-Pacific has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth

above. Georgia-Pacific has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Accordingly, Georgia-Pacific has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP. Georgia-Pacific is subject to penalties for violations of the Order and the Act occurring since October 11, 2007.

**E.      Georgia-Pacific Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Georgia-Pacific is discharging elevated levels of Iron (Fe), Total Suspended Solids (TSS), Specific Conductance (SC), and Sulfate ($SO^{2-}_4$) and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutant exceedances, Georgia-Pacific was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Georgia-Pacific was aware of high levels of these pollutants prior to October 11, 2007. Likewise, Georgia-Pacific has generally failed to file reports describing its noncompliance with the General Permit in violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). Georgia-Pacific has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since October 11, 2007, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Georgia-Pacific is subject to penalties for violations of the General Permit and the Act occurring since October 11, 2007.

**F.      Georgia-Pacific Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Georgia-Pacific has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, Georgia-Pacific reported in every Annual Report filed for the past five Wet Seasons (i.e., 2007-2008; 2008-2009; 2009-2010; 2010-2011; and 2011-2012) that it observed the first storm of every Wet Season.  However, as discussed above, based on CSPA's review of publicly available rainfall data, CSPA believes this cannot possibly be true.

Further, Georgia-Pacific failed to comply with the monthly visual observations of storm water discharges requirement for every single Annul Report filed for the Facility for each of the last five years.  In the last five Wet Seasons, Georgia-Pacific never made more than four monthly visual observations of storm water discharges, out of the eight month Wet Season.  In the 2011-2012 Annual Report, Georgia-Pacific observed only one storm event, in April 2012, and failed to observe discharge for any of the other seven months in the 2011-2012 Wet Season.  However, based on publicly available rainfall data, CSPA is informed and believes that storm events produced discharge at the Facility in most, if not every month of the 2011-2012 Wet Season.  For example, CSPA is informed and believes that there were several qualifying storm events that fell on the Facility in February 2012, including, but not necessarily limited to, Tuesday, February 7, 2012, on which date it rained 0.45".  Further, in the 2010-2011 Annual Report, Georgia-Pacific reported "no discharge" observed *for every single* month of the Wet Season.  However, CSPA is informed and believes that on Tuesday, March 15, 2011, 0.19" of rain fell on the Facility.

These are only a few examples of how Georgia-Pacific has failed to file completely true and accurate reports.  As indicated above, Georgia-Pacific has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, Georgia-Pacific has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Georgia-Pacific submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years.  Georgia-Pacific' failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Georgia-Pacific is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since October 11, 2007.

Notice of Violation and Intent To File Suit
October 11, 2012
Page 17 of 18

## IV.  Persons Responsible for the Violations.

CSPA puts Georgia-Pacific Gypsum LLC, Georgia-Pacific Building Products LLC, Robert Cyphers, Jeremiah Davis, Michael Woody, Fred Curcio, Rick Turner and Manoj Mathur under on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Georgia-Pacific Gypsum LLC, Georgia-Pacific Building Products LLC, Robert Cyphers, Jeremiah Davis, Michael Woody, Fred Curcio, Rick Turner and Manoj Mathur on notice that it intends to include those persons in this action.

## V.  Name and Address of Noticing Party.

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

## VI.  Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard                    Tel. (707) 763-7227
Erik M. Roper                        Fax. (707) 763-9227
Emily J. Brand                       Email:
Law Offices of Andrew L. Packard       Andrew@PackardLawOffices.com
100 Petaluma Boulevard, Suite 301      Erik@PackardLawOffices.com
Petaluma, CA 94952                     Emily@PackardLawOffices.com

## VII.  Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act Georgia-Pacific Gypsum LLC, Georgia-Pacific Building Products LLC, Robert Cyphers, Jeremiah Davis, Michael Woody, Fred Curcio, Rick Turner and Manoj Mathur to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

Notice of Violation and Intent To File Suit
October 11, 2012
Page 18 of 18


      CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Georgia-Pacific Gypsum LLC, Georgia-Pacific Building Products LLC, Robert Cyphers, Jeremiah Davis, Michael Woody, Fred Curcio, Rick Turner and Manoj Mathur and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.


Sincerely,


Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## **SERVICE LIST**

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

**ATTACHMENT A**
**Notice of Intent to File Suit, Georgia-Pacific (Antioch, CA)**
**Significant Rain Events,* October 11, 2007 – October 11, 2012**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dec. | 06 | 2007 | Jan. | 18 | 2010 | Mar. | 15 | 2011 |
| Dec. | 20 | 2007 | Jan. | 19 | 2010 | Mar. | 18 | 2011 |
| Dec. | 28 | 2007 | Jan. | 20 | 2010 | Mar. | 19 | 2011 |
| Jan. | 03 | 2008 | Jan. | 21 | 2010 | May | 16 | 2011 |
| Jan. | 04 | 2008 | Jan. | 22 | 2010 | Jun | 04 | 2011 |
| Jan. | 05 | 2008 | Jan. | 23 | 2010 | Jun | 05 | 2011 |
| Jan. | 08 | 2008 | Jan. | 25 | 2010 | Jun | 28 | 2011 |
| Jan. | 20 | 2008 | Jan. | 29 | 2010 | Oct. | 03 | 2011 |
| Jan. | 21 | 2008 | Feb | 04 | 2010 | Oct. | 04 | 2011 |
| Jan. | 25 | 2008 | Feb | 05 | 2010 | Oct. | 05 | 2011 |
| Jan. | 26 | 2008 | Feb. | 09 | 2010 | Oct. | 06 | 2011 |
| Jan. | 27 | 2008 | Feb. | 11 | 2010 | Nov. | 05 | 2011 |
| Feb. | 02 | 2008 | Feb. | 13 | 2010 | Nov. | 19 | 2011 |
| Feb. | 21 | 2008 | Feb. | 14 | 2010 | Nov. | 24 | 2011 |
| Feb. | 22 | 2008 | Feb. | 15 | 2010 | Dec. | 15 | 2011 |
| Feb. | 23 | 2008 | Feb. | 16 | 2010 | Jan. | 19 | 2012 |
| Feb. | 24 | 2008 | Feb. | 17 | 2010 | Jan. | 20 | 2012 |
| Nov. | 01 | 2008 | Feb. | 21 | 2010 | Jan. | 21 | 2012 |
| Dec. | 14 | 2008 | Feb. | 23 | 2010 | Jan. | 22 | 2012 |
| Dec. | 15 | 2008 | Feb. | 24 | 2010 | Jan. | 23 | 2012 |
| Dec. | 21 | 2008 | Feb. | 26 | 2010 | Feb. | 07 | 2012 |
| Dec. | 24 | 2008 | Mar. | 02 | 2010 | Feb. | 29 | 2012 |
| Dec. | 25 | 2008 | Mar. | 03 | 2010 | Mar. | 16 | 2012 |
| Jan. | 21 | 2009 | Mar. | 12 | 2010 | Mar. | 24 | 2012 |
| Jan. | 23 | 2009 | Mar. | 31 | 2010 | Mar. | 25 | 2012 |
| Jan. | 24 | 2009 | April | 04 | 2010 | Mar. | 27 | 2012 |
| Jan. | 25 | 2009 | April | 11 | 2010 | Mar. | 31 | 2012 |
| Jan. | 27 | 2009 | April | 12 | 2010 | April | 10 | 2012 |
| Jan. | 29 | 2009 | April | 20 | 2010 | April | 12 | 2012 |
| Jan. | 31 | 2009 | April | 21 | 2010 | April | 13 | 2012 |
| Feb. | 04 | 2009 | April | 28 | 2010 | April | 25 | 2012 |
| Feb. | 05 | 2009 | Nov. | 19 | 2010 | | | |
| Feb. | 06 | 2009 | Nov. | 20 | 2010 | | | |
| Feb. | 08 | 2009 | Nov. | 23 | 2010 | | | |
| Feb. | 09 | 2009 | Nov. | 27 | 2010 | | | |
| Feb. | 11 | 2009 | Dec. | 05 | 2010 | | | |
| Feb. | 12 | 2009 | Dec. | 08 | 2010 | | | |
| Feb. | 13 | 2009 | Dec. | 14 | 2010 | | | |
| Feb. | 14 | 2009 | Dec. | 17 | 2010 | | | |
| Feb. | 15 | 2009 | Dec. | 18 | 2010 | | | |
| Feb. | 28 | 2009 | Dec. | 19 | 2010 | | | |
| Mar. | 01 | 2009 | Dec. | 21 | 2010 | | | |
| Mar. | 02 | 2009 | Dec. | 22 | 2010 | | | |
| Mar. | 03 | 2009 | Dec. | 25 | 2010 | | | |
| Mar. | 04 | 2009 | Dec. | 28 | 2010 | | | |
| Oct. | 13 | 2009 | Jan. | 01 | 2011 | | | |
| Oct. | 19 | 2009 | Jan. | 02 | 2011 | | | |
| Dec. | 07 | 2009 | Jan. | 30 | 2011 | | | |
| Dec. | 11 | 2009 | Feb. | 16 | 2011 | | | |
| Dec. | 12 | 2009 | Feb. | 17 | 2011 | | | |
| Dec. | 13 | 2009 | Feb. | 18 | 2011 | | | |
| Dec. | 26 | 2009 | Feb. | 19 | 2011 | | | |
| Dec. | 27 | 2009 | Feb. | 25 | 2011 | | | |
| Jan. | 12 | 2010 | Mar. | 06 | 2011 | | | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT C**

| Parameter | Value |
|---|---|
| pH | 6.0 – 9.0 s.u. |
| Total Suspended Solids | 100 mg/L |
| Specific Conductance | 200 mg/L |
| Oil & Grease | 15 mg/L |
| Zinc | 0.117 mg/L |
| Aluminum | 0.75 mg/L |
| Selenium | 0.2385 mg/L |
| Manganese | 1.0 mg/L |